[710 NYS2d 12]

Aᴍᴇʀɪᴄᴀɴ Bᴀᴘᴛɪsᴛ Cʜᴜʀᴄʜᴇs ᴏғ Mᴇᴛʀᴏᴘᴏʟɪᴛᴀɴ Nᴇᴡ Yᴏʀᴋ et al., Appellants, v T. Eʀɪᴄ Gᴀʟʟᴏᴡᴀʏ et al., Respondents.

First Department, May 9, 2000

### APPEARANCES OF COUNSEL

*James M. Hirschhorn* of counsel, New York City (*William J. Tinsley, Jr.,* on the brief; *Sills Cummis Radin Tischman Epstein & Gross, P. A.,* attorneys), for appellants.

*Howard Zelbo* of counsel, New York City (*Marco A. Lau* and *Papaya Van Dyke* on the brief; *Cleary, Gottlieb, Steen & Hamilton,* attorneys), for respondents.

### OPINION OF THE COURT

ROSENBERGER, J. P.

This action involves the alleged misappropriation of a corporate opportunity by an officer of a charity, who was retained to help the charity develop an AIDS care facility but seized control of the project himself. The main issue presented is whether the IAS Court erred in dismissing the complaint on the ground that a not-for-profit corporation could never sustain compensable damages from the loss of a corporate opportunity.

Plaintiff American Baptist Churches of Metropolitan New York (ABC Metro) is a not-for-profit religious corporation whose charitable work includes operating Flemister House, an outreach program for AIDS patients, through two wholly owned subsidiaries (the Flemister plaintiffs). ABC Metro had retained defendant Settlement Housing Fund (SHF) in 1994 as a consultant to help develop an additional facility similar to Flemister House, namely the Noah House project at issue in the instant case.

Defendant T. Eric Galloway was first employed by SHF and later hired by ABC Metro in 1995 as Executive Director of the Flemister entities. One of his chief duties was to spearhead the Noah House project. When he was still employed by SHF, both

Galloway and SHF Executive Director Carol Lamberg had developed contacts with Great Wall Development Corp., which owned a site that appeared suitable for Noah House. ABC Metro directed Galloway to proceed with negotiations and Galloway reached an oral agreement with Great Wall to purchase the property for $250,000.

Galloway also aided ABC Metro in obtaining all the necessary government approvals and securing financing for the Noah House project. Some funding was to come from a $5.6 million loan from New York City. Additionally, a private investor agreed to invest $1.8 million in return for the right to take advantage of ABC Metro's Federal income tax credits. Of these proceeds, $1.2 million would be available to ABC Metro for use in its charitable work. (As a developer of low-income housing, ABC Metro was entitled to Federal income tax credits, but it could not use them directly because it pays no Federal income taxes, so it planned to sell them to an investor in exchange for a partnership interest in the project.) ABC Metro also expected to receive a $144,000 developer's fee at closing.

By May 1996, the approvals and financing were in place. The closing of the loan from the City was contingent on a signed contract to purchase the property from Great Wall. According to the complaint, once Galloway had completed all the development work on ABC Metro's behalf, he embarked on a scheme to seize control of the Noah House project and cut ABC Metro out of the transaction entirely. Without telling ABC Metro or the Flemister plaintiffs, Galloway instructed ABC Metro's legal counsel to incorporate Community Lantern Corp. (CLC), a not-for-profit corporation, with himself and defendants Carol Lamberg and Craig Harwood as directors. Then, once again without plaintiffs' consent, Galloway instructed the law firm to substitute CLC's name for ABC Metro's on the purchase contract with Great Wall, and to tell Great Wall's counsel to delay the purchase.

On July 7, 1996, Galloway informed plaintiffs that he was resigning and that CLC was taking control of the Noah House project. Because of his prior relationship with Great Wall, he claimed, the property owner would not sell to ABC Metro against Galloway's wishes. Indeed, Great Wall did refuse to go through with the sale, not wishing to be caught in the dispute between CLC and ABC Metro. Great Wall subsequently offered to sell the property to ABC Metro for $350,000 if defendants approved, but ABC Metro could not finance the transaction at this substantially higher price.

The Noah House project never came to fruition. Without a signed contract, ABC Metro could not obtain the loan from the City. ABC Metro alleges that as a result, it lost the $144,000 development fee and the use of $1.2 million in proceeds from the transfer of the Noah House tax credits.

Plaintiffs then brought this action alleging fraud, breach of fiduciary duty, misappropriation of corporate opportunity, and tortious interference with prospective contractual relations. In addition to challenging the sufficiency of the 17 causes of action in the amended complaint on substantive grounds, defendants also argued that the Flemister plaintiffs had no standing because they had no interest in the Noah House project. The IAS Court agreed, and dismissed the Flemister entities from the lawsuit on this basis. With respect to ABC Metro, the IAS Court dismissed all its claims on the sole ground that "[a]s a not-for-profit corporation, ABC Metro cannot satisfactorily allege damages, which would otherwise be premised upon lost profits." The court cited no legal authority for this proposition.

■ The Flemister plaintiffs were properly dismissed from the action. Since they were not involved in the Noah House project, any proceeds received in connection with the project, such as the New York City loan or the developer's fee, would have inured to the benefit of ABC Metro alone. Thus, they were not real parties in interest (*see, Columbus Natl. Leasing Corp. v Perkin-Elmer Corp.*, 177 AD2d 1035).

■ However, the order below should be modified to reinstate all but two of ABC Metro's claims. The IAS Court erred in concluding that a not-for-profit corporation could never sustain compensable damages. First of all, as a matter of public policy, it would be unfair and counterproductive for a charitable organization to have no recourse against a dishonest fiduciary who thwarts the organization's endeavors and renders futile the expenditures of time and money invested in developing the project. Second, the IAS Court's ruling rests on a fundamental misunderstanding of the nature of a not-for-profit corporation. A not-for-profit corporation is not the same as a corporation that loses money. It is simply a corporation that devotes whatever proceeds it receives from its operations to charitable causes rather than disbursing the funds as dividends to shareholders and compensation to executives. Just as the goal of a for-profit corporation is to make money for its investors, the goal of a not-for-profit is to make money that can be spent on furthering its social welfare objectives. Both types of

companies have suffered an injury when a fiduciary's miscon-
duct frustrates these goals.

The foregoing analysis is supported by the New York Not-
For-Profit Corporation Law, which clearly contemplates that
not-for-profit corporations may receive income and even make
an incidental profit. What distinguishes a not-for-profit is not
whether it receives money, but what it does with the money.
Not-For-Profit Corporation Law § 102 (a) (5) defines a not-for-
profit as a corporation which is organized "exclusively for a
purpose or purposes, not for pecuniary profit or financial gain,"
and "no part of the assets, *income or profit* of which is
distributable to, or enures to the benefit of, its members, direc-
tors or officers except to the extent permitted under this stat-
ute" (emphasis added). Section 508 allows a not-for-profit to
earn an "incidental profit" from fees or charges, so long as such
profits are "applied to the maintenance, expansion or operation
of the lawful activities of the corporation," and not "divided or
distributed in any manner whatsoever among the members,
directors, or officers of the corporation."

Not-for-profit corporations in New York routinely bring ac-
tions seeking damages for breach of contract, breach of fidu-
ciary duty and fraud (*e.g.*, *Spingold Found. v Wallin, Simon,
Black & Co.*, 184 AD2d 464; *Cobble Hill Nursing Home v Henry
& Warren Corp.*, 196 AD2d 564, 568-569, *lv denied* 83 NY2d
756). While no New York case appears to have dealt with a
not-for-profit's claim for diversion of a corporate opportunity, a
number of cases from other States recognize that a not-for-
profit may bring such a claim (*e.g.*, *White Gates Skeet Club v
Lightfine*, 276 Ill App 3d 537, 658 NE2d 864; *Valle v North
Jersey Auto. Club*, 141 NJ Super 568, 359 A2d 504, *mod* 74 NJ
109, 376 A2d 1192; *Lutherland, Inc. v Dahlen*, 357 Pa 143, 53
A2d 143). By contrast, there is no case law supporting the IAS
Court's contrary conclusion.

Here, ABC Metro pleaded at least two specific items of
monetary damage flowing from defendants' alleged misconduct:
the loss of ABC Metro's expected $144,000 development fee
and the loss of the $1.2 million from the planned sale of Noah
House's tax credits. Defendants dispute whether ABC Metro
satisfied the conditions precedent to receiving these funds, but
these are questions for the trier of fact. In addition, ABC Metro
alleges that it has lost the money it expended to develop a
project that never came to fruition because of defendants'
interference. These allegations are sufficient to withstand a
motion to dismiss.

■■■ Turning now to the merits of the individual causes of action, we conclude that the first through ninth and the eleventh through sixteenth causes of action asserted by ABC Metro should be reinstated.

Most of the claims encompass essentially the same allegations, phrased differently. The first cause of action alleges that Galloway breached his fiduciary duty of loyalty and good faith by secretly creating a competing organization to seize control of Noah House and exploiting the work already done by ABC Metro on developing the project. The second cause of action alleges that SHF and its Executive Director Lamberg, as consultants hired by ABC Metro, breached their duty of good faith in that, after being involved in negotiating for the purchase of the property from Great Wall, SHF and Lamberg attempted to take control of both the project and the property. The third cause of action asserts a breach of contract claim against SHF based on the same allegations. The fourth and fifth causes of action are asserted against Galloway and against SHF and Lamberg, respectively, for diversion of corporate opportunity.

An agent may not divert or exploit for his own benefit an opportunity that is an asset of his principal (*Alexander & Alexander v Fritzen*, 147 AD2d 241, 246). Nor may he make use of the principal's resources or proprietary information to organize a competing business (*Schneider Leasing Plus v Stallone*, 172 AD2d 739, 741, *lv dismissed* 78 NY2d 1043). It would be a breach of fiduciary duty if an agent of a corporation secretly established a competing entity so as to divert opportunities away from his principal (*Wolff v Wolff*, 67 NY2d 638, 641).

■■■ In support of dismissal, Galloway argues that he owed no fiduciary duty to ABC Metro because he was an employee of the Flemister entities, not of ABC Metro. To the contrary, the facts as alleged in the complaint indicate that he was acting as ABC Metro's agent with respect to Noah House, in addition to whatever services he performed for the Flemister entities. Moreover, he cannot have it both ways: to defeat the Flemister plaintiffs' standing, he asserts that they had no relation to his work on Noah House, but to defeat ABC Metro's claims, he asserts that he was the Flemisters' agent. At the very least, this inconsistency concerning the relationship between the parties must be resolved in further proceedings.

SHF argues that the contract with ABC Metro is void under General Obligations Law § 5-701 because a contract to procure a loan or negotiate a real estate purchase must be in writing. However, the complaint alleges that SHF's role was broader

than this, namely, that SHF was employed as a paid consultant to assist in developing Noah House and possibly another property. Thus, the claim for breach cannot be dismissed at this stage.

▮ The sixth and seventh causes of action allege that Galloway, Lamberg and SHF committed fraud. Defendants argue that the complaint does not list the alleged misrepresentations in sufficient detail, and that, in any event, the loss of the project was proximately caused by Great Wall's decision to raise the purchase price, not by defendants' actions (*see, Williams v Upjohn Health Care Servs.*, 120 AD2d 729, 730 [requiring causal link between misrepresentations and injury]). However, a cause of action for fraud may be based on a fiduciary's intentional concealment of a material fact (*see, Mobil Oil Corp. v Joshi*, 202 AD2d 318). Here, ABC Metro has adequately alleged that defendants concealed a series of actions that were adverse to ABC Metro's interest in Noah House, including the creation of CLC and the alteration of the purchase contract. As to causation, the complaint alleges that in furtherance of defendants' scheme to divert and delay the project, they relied on their prior relationship with Great Wall to induce Great Wall to renege on its previous intention to sell to ABC Metro at an affordable price.

▮ The eighth cause of action seeks to pierce the corporate veil against Galloway, Lamberg and Harwood, on the ground that CLC was incorporated under false pretenses, for no purpose other than to help them seize control of Noah House. These allegations establish the elements of a veil-piercing claim, namely, that the owners completely dominated the corporation and that such domination was used to commit a wrong against the plaintiff (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141). Nothing in the record indicates any other purpose for CLC's existence.

▮ The ninth cause of action against all defendants for tortious interference with prospective contractual relations should also be reinstated. ABC Metro has alleged that defendants used wrongful means, namely, deceptive actions in derogation of their fiduciary duties, to induce Great Wall not to sell the property on the previously agreed terms (*see, Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183, 191). This is not a situation where an arm's length competitor uses ordinary free-market means to persuade a third party not to transact business with the plaintiff. However, the tenth cause of action for tortious interference with existing contractual relations

was properly dismissed because no contract for the sale of the property was ever signed (*see, NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614, 620-621).

The eleventh through sixteenth causes of action charge the defendants other than Galloway with aiding and abetting his breach of fiduciary duty, diversion of corporate opportunity and fraud. Defendants argue that these causes of action are deficient because the complaint does not contain sufficient allegations that they knew or should have known about Galloway's misconduct, nor that they rendered substantial assistance to him. However, the pleadings support a theory that all defendants acted in concert. According to the complaint, CLC was formed by the individual defendants months before ABC Metro's scheduled closing date on the Noah House project, and immediately moved to take over the project when Galloway resigned. Defendants also allegedly exploited Great Wall's prior relationship with SHF to frustrate the sale. In any event, what the parties actually knew is a matter for discovery, since much of the information is in defendants' control.

Finally, the seventeenth cause of action for civil conspiracy was properly dismissed because it was redundant. While in New York there is no separate tort of conspiracy, allegations of conspiracy are permitted "to connect the actions of separate defendants with an otherwise actionable tort" (*Alexander & Alexander v Fritzen*, 68 NY2d 968, 969, *supra*). Here, ABC Metro's other claims have already pleaded these torts and defendants' alleged collusion to commit them.

With respect to all causes of action asserted against them in their capacity as directors of CLC, Lambert and Harwood argue that they have immunity under Not-For-Profit Corporation Law § 720-a as uncompensated directors of a not-for-profit corporation. Yet, the statute contains an exception where the director's harmful conduct was grossly negligent or intentional. It would be premature to find that Lamberg and Harwood have immunity as a matter of law, since ABC Metro has alleged in detail that these defendants formed CLC so as to assist Galloway's deceptive scheme and appropriate the Great Wall property for themselves. This would come within the statutory exception for intentional misconduct.

Accordingly, the order of the Supreme Court, New York County (Ira Gammerman, J.), entered November 13, 1998, granting defendants' motion to dismiss the amended complaint, should be modified, on the law, to reinstate the first through ninth and the eleventh through sixteenth causes of action, only

to the extent asserted by plaintiff American Baptist Churches of Metropolitan New York, and otherwise affirmed, without costs.

WALLACH, ANDRIAS and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered November 13, 1998, modified, on the law, to reinstate the first through ninth and the eleventh through sixteenth causes of action, only to the extent asserted by plaintiff American Baptist Churches of Metropolitan New York, and otherwise affirmed, without costs.